# SUPREME COURT

OF THE

## STATE OF IOWA

AT

## DES MOINES.

---

F. L. ROGERS et al., Appellees, v. BOARD OF SUPERVISORS OF
CERRO GORDO COUNTY et al., Appellants.

DRAINS: Assessment—Presumption. An assessment which is affirm-
atively shown to have been made by the commissioners, and to
have been confirmed by the board of supervisors only after ex-
haustive, painstaking, and personal investigation and considera-
tion of all essential elements entering into and bearing on an equi-
table assessment, carrying, as it does, a very strong presump-
tion of correctness, must stand, unless the landowner by clear and
convincing evidence establishes that it is erroneous or inequitable
in fact, and that the assessment contended for by him would be
more equitable—more in proportion to benefits.

*Appeal from Cerro Gordo District Court.*—J. J. CLARK, Judge.

SEPTEMBER 26, 1922.

REHEARING DENIED JANUARY 16, 1923.

THE opinion sufficiently states the case.—*Reversed.*

*W. A. Westfall* and *M. H. Kepler,* for appellants.

*E. B. Stillman* and *Senneff, Bliss, Witwer & Senneff,* for appellees.

DE GRAFF, J.—On March 31, 1919 the board of supervisors of Cerro Gordo County for and on behalf of Drainage District No. 40 confirmed the report of the commissioners to assess benefits in said drainage district. Certain lands of the appellees were involved in this assessment. Objections were filed by appellees with the board of supervisors which were overruled and an appeal was taken to the district court. The assessments were very materially reduced and from the decree entered by the trial court the board of supervisors appeal.

The district in question was legally formed and the commission was regularly appointed to make the assessments. The district comprised lands in four townships and was both open ditch and tile laterals. The length of the open ditch is about seven miles. The appellees are the owners of 301 acres involved on this appeal. This comprises seven 40's and 21 acres out of another 40. All of this land is in the open ditch section and five of the 40's are traversed by the open ditch. For the purpose of making the assessment the district was divided into sections. Each main lateral was a section and the open ditch territory was a section.

Three kinds of land appear in the classification: swamp, wet and dry. Each of these kinds of land in each 40 of the drainage district was measured for the purpose of platting and assessment. The commissioners viewed each 40 in the district and the swamp acres were classified from 100 per cent to 70 per cent and the wet acres from 70 per cent to 30 per cent. In making the classification the commissioners took into consideration the character of the land, the vegetation, the elevation, soil and subsoil conditions, proximity to outlet, direct drainage furnished by laterals running through the lands, tile previously put in and the outlet of same, and whether or not it was a free and open outlet and gave adequate and efficient drainage.

The commissioners spent six weeks in going over the lands within the district and in making comparisons and fixing the

assessments on the individual 40's.   The swamp and wet areas were measured to determine the size and number of acres in each classification.   Each 40 was traversed and compared with every other 40 and each 40 was particularly compared with the 100 per cent 40 which was the basis or unit of classification. The appellees owned an 80 acres immediately north of the land involved in this appeal and one of the 40's of this 80 is the 100 per cent 40.

The board of supervisors also spent several days in going over the lands within the district and making comparisons of the different 40's prior to confirming the commissioners' report.

After the classification was made the classified lands were all reduced in per cent to swamp acres, and after the swamp acres had been determined on each 40 it was then reduced to dollars to make the assessment against each particular tract in the district.   The commissioners fixed the sum of $60 as a swamp acre charge for each classified swamp acre within the section.   In fixing the assessment of the lands owned by appellees the commissioners allowed for a strip of land 60 feet in width taken by the improvement.

The commissioners attempted to assess lands along the main ditch in such manner that lands similarly located would pay the same amount for benefits as lands along the laterals would pay considering the elevation, proximity factor, fertility, etc.   They compared not only the tracts lying immediately adjacent to the main ditch and the tile line, but a comparison with various lands located in the main section was made with various lands located in laterals.   Each 40 was compared with a great many 40's.   The engineer for the board testified: ''In making the assessment we have the total amount of money which is to be raised for each lateral, that is estimated cost.   We made a comparison of the lands lying in the main or open ditch section with lands similarly located with respect to outlet and of similar classification in the different laterals in the district, taking into consideration, of course, the elevation of the land in the main and the elevation of the land in the laterals.''

A court must give weight and due deference to the acts of the commissioners and the board in making an assessment, when it is shown that their investigation and inspection was personal

and complete. In the instant case there is a clear and satisfactory showing in these particulars. We will presume that both commissioners and board in making the assessment acted impartially, honestly and with intelligence. To set aside or modify the findings there must be evidence that impeaches their judgment officially expressed. There must be a showing that the essential elements or some of them which should enter into the estimate were not considered by the board or that an erroneous assessment and an inequitable apportionment was made.

In making a classification the board must adopt a method and confirm assessments within the purview of the statute, and if the method adopted secures equitable and fair assessments they ought not to be disturbed on appeal. All lands within the district are presumed to receive benefits and we recognize that the commissioners and board are in a better position to classify land for assessment purposes than any other tribunal, and in the absence of fraud, gross error, or evident mistake the classification adopted must be treated as the correct one. The cost of a drainage improvement can be met only by assessments on the property located within the district, and the test of an assessment is not whether the assessment on a particular tract of land exceeds actual benefits, but whether it represents a fair proportional part of the total cost of improvement. It may be expected that the judgment of experts will not coincide although there may be no dispute as to the facts upon which the judgment is predicated. The two experts for appellees do not agree in the quantum of assessment as to particular tracts, nor does the judgment of the engineer of the board coincide with the board in the number of benefited acres and the judgment of the trial court agreed completely with none of them.

In order that the decree may stand it must be said under the record that the assessments fixed by the court are more accurate and are based on a more scientific classification, and are in more complete harmony with statutory rule than the classification and assessment by the board. An assessment by the board presupposes that it has availed itself of all available and material first-hand information and in making the assessments that they exercised reasonably painstaking care. That this was done is amply shown by the record. The rule of ju-

dicial deference to the action of the board requires complaining landowners to show cause why the assessments should not stand. They have the burden of proof.

The question squarely presented is this: Does the evidence give a court a basis upon which to fix an assessment other and different than that returned by the commissioners to assess benefits and confirmed by the board, so that such assessment will be more equitable and more nearly in proportion to the costs of the improvement and the benefits received?

Appellees have failed to point out a method more fair or just than that adopted by the board. The theory of any classification is that the percentage fixed upon is comparative only. Approximation is the best that any board or court can do, and if the basis of the board is fair it does not justify our interference where the evidence fails to show an erroneous classification or one that materially departs from the purview of the statute in making computation. We will presume that the engineers for the board had no interest in the matter and were not partisan in any sense.

What is the quarrel in this case? We conclude that it turns on the factor of elevation. This was the dominant thought in the minds of the engineers of appellees and it was the thought in the mind of the trial court. Engineer Smith for the appellees testified: "The plan of assessment followed by the engineer of the board is in a general way the plan I followed. I have no particular quarrel with the plan. The plan as I understand it followed by Mr. Keerl [engineer for the board] is the usual plan of engineers. Of course it is necessary that one should examine the other lands which are also classified to see if the relation is carried out. To arrive at an equal adjustment I think it would be necessary to become familiar with all of the tracts and their classification which are assessed in this particular section, by that I refer to the open ditch section."

One trouble with appellees' theory is that this plan was not carried out by them and there was no comparison of appellees' 40's with other 40's, or with very few. We quote from the record to show that the primary thought in attacking the assessment was predicated on elevation. Appellees' engineer Gjellefald in speaking of the 40 known as No. 1 on this appeal tes-

tified: "There is no reason to include anything above the 8-foot point from an engineering standpoint. If you take an 8-foot elevation and take that standard for this 40 I do not believe they can get over about 15 acres of benefited land."

The chief engineer Smith testified that lands should not be assessed if they have opportunity for tiling without the improvement if they have adequate outlet. To meet this issue Engineer Lyford testified on behalf of the board: "I have seen assessments where the elevations were not kept track of at all. I consider elevation in a general way only. Elevations do not determine the classification of land at all. I noticed where they got to a 10-foot elevation they [appellees] classified it as high land. I would still classify it as wet land, if you have an opportunity to tile it. No matter how high the land is if it is wet, I classify it as wet. I might give it a little benefit of the elevation but I would classify and assess it as wet land."

The trial judge in colloquy with one of the attorneys for appellees said: "For instance you are claiming here that there is absolutely no benefit to this land whatever, you could drain it just as well without the ditch."

It is shown that engineers for appellees "took no elevations of any land outside of the 40's in question in this suit," and the chief engineer testified, "I took largely into consideration in making my classification the actual contour of the land and the actual elevation and the question of whether it would be properly and adequately drained without the proposed ditch," and he stated that the only thing he took into consideration was the elevation and this is the reason why the high land should not be assessed.

There is no dispute about levels or elevations in the instant case but it is contended that above certain elevations certain lands which were listed as receiving benefits by the board did not receive such benefits. We recognize for the purpose of assessment that there is no strict line of demarcation between wet and dry areas, but it would be purely arbitrary to establish a classification by survey and say that all lands above a fixed point received no benefits.

The evidence in this case clearly shows that quite a little of the land of appellees above the elevations established was

wet and boggy caused by seepage and the inability of the water to find an outlet. .Elevation is a factor and it was so considered by the commissioners and the board, but we cannot stress this factor to the exclusion of other matters vital in fixing a proportional assessment. To do so would eliminate all consideration of the character of such land whether. wet or dry. It would also eliminate the character of the subsoil and the fact, as is shown in this case, that the cutting through of impervious clay subsoil permitted the waters to drain and thereby gave a special benefit. It would also in part at least prevent a comparison of the different 40's in the district with each other in determining the proportional share of the cost of the improvement and this was not attempted by appellees in this case. In fact it would leave nothing to the judgment of the commissioners or board but an arbitrarily fixed mathematical line. The commissioners as stated took the matter of elevation into account, but they also took important matters into consideration which appellees' experts overlooked.

The claim of appellees is that nature gave these lands an opportunity for drainage, yet the testimony shows that the slopes of these elevated lands were wet. Appellees' engineers classified lands as low which were low in elevation. One of them testified: ''Other than the swamp acres I assessed it (speaking of a certain 40) could be drained into Willow Creek because the plans of the tract elevated from 9 to 10 feet above the bottom of the old Willow Creek which was entirely sufficient for adequate drainage.'' This would deny any benefit to the land above the stated elevation and clearly did not result in a fair and equitable assessment under the record facts. The assessments are high but a court may not without just cause reduce such assessments from 50 to 75 per cent.

It will be noticed that the engineers for appellees used the swamp acre charge as fixed by the commissioners, to wit: $60 per swamp acre and such a classification by reducing materially the number of swamp acres would necessarily increase the swamp acre charge.

We are not impressed with the classification or results offered by appellees and the evidence tendered by them fails to give a basis upon which to fix an equitable assessment. Evidence

must be clear and convincing that an assessment as fixed by the commission is erroneous or inequitable and not in proportion to the cost of the entire improvement and the benefits received. The classification suggested is purely arbitrary and under the rule a considerable portion of the land within the drainage district would be eliminated as receiving no benefits.

Under an elevation theory we are left in a field of conjecture. We discover no valid ground on which to question the equitable character of the assessment as made. It was made by men experienced in such service and after a most careful study and inspection by them and also by the board of supervisors who were also experienced and had personal knowledge of the lands involved.

This drainage district included about 16,000 acres and of this there were 6,220 swamp acres. It was a territory that needed drainage and this is conceded. Appellees' lands were in close proximity to a well recognized swamp area. The lands were generally wet, boggy and unfit for cultivation. The improvement through the drainage district removed the waters and caused the same to flow through the newly constructed open ditch. As the engineer of the board testified: "There is a great difference in the appearance of the land before and after the improvement was put in. It would be very difficult to make a classification of these lands at this time where the lands have been broken up. It is very difficult at a later time to classify these lands as they were before the improvement was constructed and it would be very difficult to make (a new) classification."

We could incumber this opinion by an individual analysis of the evidence concerning each 40 involved but in view of the conclusion announced this would serve no useful purpose. The classification of the board and of appellees respectively cannot be harmonized and we have stated our reasons why we cannot accept the theory of appellees. The assessments fixed by the board are a fair proportional part of the total cost of the improvement and its equity and fairness are not impeached. The assessments as fixed must be and are confirmed. Wherefore the judgment and decree entered by the trial court is—*Reversed.*

WEAVER, PRESTON, and ARTHUR, JJ., concur.